## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:  SAXBY'S COFFEE WORLDWIDE, LLC | : | **Chapter 11** |
| | : | |
| Debtor(s) | : | **Bky. No.  09-15898 ELF** |
| | : | |
| SAXBY'S COFFEE WORLDWIDE, LLC | : | |
| | : | |
| Plaintiff(s) | : | |
| | : | |
| v. | : | |
| | : | |
| | : | **Adv. No.  09-0340** |
| JOHN LARSON, et al. | : | |
| | : | |
| Defendants | : | |
| | : | |

# M E M O R A N D U M

## I.

Saxby's Coffee Worldwide, LLC ("the Debtor") filed a chapter 11 bankruptcy petition in this court on August 5, 2009.  On November 2, 2009, the Debtor initiated this adversary proceeding by filing a complaint ("the Complaint") against thirteen (13) Defendants (collectively, "the Defendants").   On the same day, the Debtor filed a motion for preliminary injunction ("the Motion") and a request for an expedited hearing on the Motion.

In the Complaint and the Motion, the Debtor identifies eight (8) lawsuits (collectively, "the Non-Bankruptcy Cases") filed by the Defendants.  When the Debtor filed this bankruptcy case, the Non-Bankruptcy Cases were pending against the Debtor and, inter alia, six (6) particular non-debtor parties (collectively, "the Related Non-Debtors").  The Related Non-Debtors are three (3) natural persons, who are insiders and three (3) entities owned and controlled by one of

the insiders.

The Debtor seeks an injunction under 11 U.S.C. §105(a) to restrain the Defendants from proceeding against the Related Non-Debtors in the Non-Bankruptcy Cases.[1]  The Debtor also requests that the Defendants be restrained from proceeding against the Related Non-Debtors in any pending litigation not identified in the Complaint or any litigation that the Defendants may intend to initiate.

Some, but not all, of the Defendants responded to the Complaint and the Motion.  The responding parties are the plaintiffs in five (5) of the eight (8) Non-Bankruptcy Cases identified in the Complaint.

The responding Defendants in four (4) of the Non-Bankruptcy Cases appeared at the hearing, either pro se or through counsel, and opposed the Motion. The answering Defendants who are the plaintiffs in one (1) of the Non-Bankruptcy Cases appeared through counsel at the preliminary injunction hearing and consented to the relief requested by the Debtor.

The court held an evidentiary hearing on the Motion on November 18, 2009.  At the conclusion of the hearing, the court took the matter under advisement.  None of the parties requested the opportunity to file a post-hearing memorandum.

For the reasons set forth below, the Motion will be granted in part and denied in part. The

---

[1]      The Debtor is a defendant in seven (7) of the eight (8) lawsuits.  There is no dispute that the seven (7) lawsuits have been stayed as to the Debtor as a result of the bankruptcy filing.  See 11 U.S.C. §362(a).

I also note that the Debtor's President, Nicholas Bayer, testified that there were eighteen (18) lawsuits pending against the Debtor when the bankruptcy case was filed.  Mr. Bayer provided no further details regarding the ten (10) lawsuits that were not identified in the Complaint.  I infer that the Related Non-Debtors were not named as defendants in those ten (10) cases, that all activity has been stayed and that the Debtor saw no need to seek any further relief from this court in connection with those cases.

injunction will be granted with respect to the three (3) Non-Debtor Parties who are natural

persons and will be denied as to the three (3) Non-Debtor Parties that are artificial entities.

Further, the preliminary injunction restraining the Defendants will be subject to certain

conditions and its term will be circumscribed as detailed below.

## II.

### A.

The Debtor was formed as a business entity in the form of a limited liability company

("LLC") in July 2007.  It has two (2) members: Joseph Grasso (70% interest) and Kevin Meakim

(30% interest).  Grasso and Meakim created the Debtor as the vehicle for purchasing the assets of

an entity called Saxby's Coffee Inc. ("SCI").  The Debtor purchased the assets of SCI in July

2007. Grasso and Meakim had no prior relationship with SCI or its principals prior to the

transaction.

SCI is a corporation formed by Nick Bayer ("N. Bayer") and John Larson in 2005.  Prior

to the sale of its assets to the Debtor, SCI was a coffee house franchisor.  In July 2007, it had

approximately twenty (20) shareholders and approximately twenty (20) active franchise

locations.  N. Bayer, who was both an officer and shareholder of SCI, acted on SCI's behalf in

negotiating the terms of the asset sale transaction between SCI and the Debtor.  After

consummation of the transaction, N. Bayer became the President and CEO of the Debtor.  He is

not a member of the Debtor LLC and has no ownership interest in the entity.

Since its inception and purchase of SCI's assets, the Debtor also has been a coffee house

franchisor.  This business involves the marketing, selling and administering of franchise

agreements for the operation of retail coffee shops.  The Debtor generates revenue from franchise fees paid by new franchisees at the inception of the franchise relationship, as well as by ongoing franchise fees paid to the Debtor by operating franchisees.

As a result of the July 2007 SCI-Debtor transaction, the Debtor obtained SCI's twenty (20) franchise agreements.  Since then, the Debtor closed eleven of those locations, but opened thirty (30) to thirty-five (35) new locations.  Presently, the Debtor has more than forty (40) franchise locations in operation.  Most are owned by independent franchisees.  Several are operated either by the Debtor or by insider franchisees.

The Debtor attributes its expansion since 2007, in part, to the capital infusions it has received from Grasso and from an institutional lender.  The Debtor credits Grasso for its ability to obtain institutional financing.[2]

The Debtor LLC is governed by a Limited Liability Company Operating Agreement ("the Operating Agreement").  (Ex. D-4).  The Operating Agreement was executed on July 20, 2007 by the Debtor's two (2) members, Grasso and Meakim.  It states that the purpose of the Debtor, inter alia, is to "purchase, own, manage, develop and lease retail locations that sell coffee, beverages made with coffee, and related items . . . ."  (Id. ¶3).  It also provides, in pertinent part:

---

[2]      Grasso's testimony suggests that he considers himself the financial backbone of the Debtor  −  he has invested more than $1 million in the company and personally guaranteed the Debtor's bank loans.  Grasso implied that the Debtor's past ability to obtain bank financing was based on his financial wherewithal.  He described himself as being in the business of "developing businesses."  He testified that he has owned in the past and continues to own numerous businesses, including various real estate holdings, a shopping center, a bowling alley and a restaurant.  Grasso provided little specificity regarding his business assets, other than mentioning that he owns a restaurant called the "Union Trust," and he did not quantify the value of his holdings.  Nonetheless, I have no reason to question the benefit the Debtor has derived from Grasso's involvement and his personal wealth.  Grasso also testified that he intends to invest more money in the company to assist in its reorganization, although he did not know how much that would be and stated candidly that it would be "as little as possible."

13.  <u>Management</u>.   . . . [M]anagement of the Company will be vested in the
Managing Member.  The Manging Member will have the power to do any and all
acts necessary, convenient or incidental to or for the furtherance of the purposes
described herein . . . .   The Managing Member may delegate his management
powers to a manager or managers.  <u>Kevin Meakim will serve as the initial</u>
<u>Managing Member</u> . . . .

14.  <u>Exculpation and Indemnification</u>.   No Member will be liable to the
Company, or any other person or entity who has an interest in the Company for
any loss, damage or claim incurred by reason of any act or omission performed or
omitted by such Member in good faith on behalf of the Company and in a manner
reasonably believed to be within the scope of the authority conferred on such
Member by this Agreement, except that a Member will be liable for any such loss,
damage or claim incurred by reason of such Member's willful misconduct.  To the
fullest extent permitted by applicable law, <u>a Member will be entitled to</u>
<u>indemnification from the Company for any loss, damage or claim incurred by such</u>
<u>Member by reasons of any act or omission performed or omitted by such Member</u>
<u>in good faith on behalf of the Company and in a manner reasonably believed to be</u>
<u>within the scope of the authority conferred on such Member by this agreement</u>,
except that no Member will be entitled to be indemnified in respect of any loss,
damage or claim incurred by such Member by reason of willful misconduct with
respect to such acts or omissions . . . .

(<u>Id.</u> ¶14) (emphasis added).

There is no written employment contract between the Debtor and its CEO, N. Bayer.

There is no written indemnity agreement between the Debtor and N. Bayer.  Nonetheless, before

the bankruptcy case was filed, the Debtor was paying the legal expenses incurred by N. Bayer in

the Non-Bankruptcy Cases,[3] as well as the legal expenss of the other Non-Debtor Parties.[4]

From the evidence presented, it appears that N. Bayer, Grasso and Meakim are all active in the management of the Debtor, with duties that substantially overlap.[5]  The amount of time N. Bayer, Grasso and Meakim each devote to management of the Debtor was not quantified with any precision.[6]

---

[3]       With respect to N. Bayer, who is not a member of the LLC and therefore, not covered by ¶14 of the Operating Agreement, Grasso testified that, at some point during the negotiations that result in the SCI asset sale to the Debtor and the Debtor's retention of N. Bayer as President and CEO, he agreed to indemnify N. Bayer from claims arising from the transaction. Grasso's testimony was vague on this point.  For example, it was not entirely clear from his testimony whether he made the oral agreement on behalf of the Debtor or himself.  In any event, as explained in Part V., infra, I need not decide whether the Debtor is legally obligated to indemnify N. Bayer.

[4]       The Debtor has paid some, but not all, of the legal expenses incurred by the Related Non-Debtors and by the Debtor itself.  N. Bayer testified that the legal expenses arising from the Non-Bankruptcy Cases exceeded $1 million and the Debtor actually paid amounts totaling "in the six (6) figures."

[5]       In his testimony, N. Bayer described himself as the "CEO" and described his primary duties as the development of new franchises and the stabilization of existing franchises.  N. Bayer described Meakim as playing an important role in retail site selection, marketing and day-to-day operations.  The thrust of Grasso's testimony was that while the Debtor is only one business among his many, it takes up a disproportionate amount of his time and attention due to its legal and financial difficulties (although he was unable to quantify the amount of time he regularly spends in connection with the Debtor's affairs).  He depicted himself, not as a passive investor, but rather, as an owner who plays a significant role in management of the Debtor's operations  –  in particular, drawing on his restaurant background in developing menu selections for distribution to the franchisees.

The testimony regarding the management of the Debtor was not as precise as might be ideal.  However, I attribute the lack of detail to the nature of the proceeding  – an expedited preliminary injunction hearing lasting one-half day.  In these circumstances, I found the evidence sufficient to convince me that N. Bayer, Grasso and Meakim all play significant roles in the management of the Debtor.

[6]       I infer from N. Bayer's testimony as a whole that he works full-time for the Debtor and I find this credible.  Grasso was unable to quantify the amount of time that he spends assisting in the management of the Debtor, but contended that it was substantial.  In light of his role in the company

(continued...)

**B.**

**1.**

Several of the Non-Bankruptcy Cases are rooted, in one way or another, in the asset purchase agreement between the Debtor and SCI.  The plaintiffs in several of those cases (Defendants in this adversary proceeding) are shareholders of SCI who contend that the asset sale transaction constituted a fraudulent transfer of SCI's assets.  Another of the Non-Bankruptcy Cases involves the claim of a law firm for payment of the counsel fees incurred in defending the Debtor and certain Non-Debtor Parties in one of the "fraudulent transfer-based"  Non-Bankruptcy Cases.

Other Non-Bankruptcy Cases are unconnected to the asset sale transaction and, instead, are based on alleged breaches of lease guaranties or other contracts between the plaintiffs and SCI.  In these lawsuits, the Debtor and certain of the Related Non-Debtors were named as defendants based on "alter ego" or other legal theories.

**2.**

The state and federal court lawsuits identified by the Debtor in the Complaint, the Motion and at the hearing are set out below:

  1. John Larson and Greg Bayer[7] v. Saxby's Coffee, Inc. and Nicholas Bayer, No. 07CH17258 (Cir. Ct., Cook Cty., Ill.) ("**the John Larson Case**");

---

[6](...continued)
(both financially and operationally), I credit that testimony as well.  As for Meakim, there was no evidence quantifying the amount of time he spends in managing the Debtor.

[7]        Greg Bayer is N. Bayer's uncle.

2. Douglas Fabschutz, Simon Fabschutz, Irene Fabschutz, Andrew Field and Gary Fabschutz v. Saxby's Coffee, Inc., Nick Bayer, John D. Larson, Proven Record, Inc., Saxby's Coffee Worldwide, LLC, Walnut Street Capital, LLC and Walnut Street Management Group, LLC, No. 07-CV-0222 (D. Colo.) ("**the Fabschutz Case**");

3. Marshall J. Katz v. Joseph Grasso, Kevin Meakim, Robert D. Carroll, Nicholas Bayer, Walnut Street Capital, LLC, Saxby's Coffee, Inc, and Saxby's Coffee Worldwide LLC, No. CH24116 (Cir. Ct., Cook Cty., Ill.) ("**the Katz Case**");

4. Segal McCambridge Singer & Mahoney, Ltd. v. Nicholas Bayer, Kevin Meakim, Joseph Grasso, Saxby's Coffee, Inc., Saxby's Coffee Worldwide, LLC, Walnut Street Capital, LLC, and Walnut Street Capital Management Group, LLC, No. 2008-L-12521 (Cir. Ct., Cook Cty., Ill.) ("**the Segal McCambridge Case**");

5. Kamros Holdings, LLC v. Saxby's Coffee, Inc., Saxby's Coffee Worldwide, LLC, Nick Bayer, Doe Defendants I-X, and Roe Corporate Defendants XI-XX, No. A572282 (Dist. Ct., Clark Cty, Nev.) ("**the Kamros Case**");

6. The Exchange Ontario Center, Inc. v. Saxby's Coffee, Saxby's Coffee Worldwide, Nick Bayer and Does 1-10, No. CIVRS809627 (Super. Ct., San Bernardino Cty., Cal.) ("**the Exchange Ontario Case**");

7. Jennifer Larson v. Saxby's Coffee, Inc., Nick Bayer, and Saxby's Coffee Worldwide, LLC, No. 79D04-0808-SC-03900 (Super. Ct., Tippecanoe Cty., Ind.) ("**the Jennifer Larson Case**");

8. Goodwill Investments, LLC v. Saxby's Coffee, Inc.,Walnut Street Capital Management, LLC; Saxby's Coffee Worldwide, LLC; No. 09CH16343 (Cir. Ct., Cook Cty., Ill.) ("**the Goodwill Case**").

The John Larson Case, the Fabschutz Case, the Katz Case, the Segal McCambridge Case and the Jennifer Larson Case appear related to the SCI-Debtor asset sale transaction.  The Exchange Ontario Case, the Kamros Case and the Goodwill Case appear related to contracts entered into by SCI.

**3.**

The Related Non-Debtors whom the Debtor seeks to "protect" through the requested

§105 injunction are:

1. N. Bayer;

2. Grasso;

3. Meakim;

4. Walnut Street Capital, LLC ("WSC"), an entity owned and controlled by Grasso;

5. Walnut Street Capital Management Group, LLC ("WSCMG"), an entity the Debtor alleged in the Complaint and Motion is owned and controlled by Grasso; and

6. Coffee Shops International, Inc. ("CSI"),[8] an entity owned and controlled by Grasso and Meakim.

Set forth below is a table that sets out which Non-Debtor Parties are defendants in each

Non-Bankruptcy Case identified in the Complaint:

---

[8]      CSI is an entity created by Grasso and Meakim to purchase a company called "Bucks County Coffee" ("BCC"). BCC also operated retail coffee shops. Another part of BCC's business was to buy and roast coffee beans. After purchasing BCC, CSI became a supplier of coffee to the Debtor's franchisees. Grasso also testified that the Bucks County Coffee retail locations became franchise locations of the Debtor. He did not explain how this occurred.

|                       | N. Bayer | Grasso | Meakim | WSC | WSCMG | CSI |
|-----------------------|----------|--------|--------|-----|-------|-----|
| John Larson Case      | ✓        |        |        |     |       |     |
| Fabschutz Case        | ✓        |        |        | ✓   | ✓     |     |
| Katz Case             | ✓        | ✓      | ✓      | ✓   |       | ✓   |
| Segal McCambridge Case| ✓        | ✓      | ✓      | ✓   | ✓     |     |
| Kamros Case           | ✓        |        |        |     |       |     |
| Exchange Ontario Case | ✓        |        |        |     |       |     |
| Jennifer Larson Case  | ✓        |        |        |     |       |     |
| Goodwill Case         |          |        |        | ✓   |       |     |

**4.**

The Defendants who responded to the Motion are the plaintiffs in the John Larson Case, the Fabschutz Case, the Katz Case, Segal McCambridge Case and the Exchange Ontario Case. All of the responding parties, except the Fabschutz plaintiffs, oppose the relief requested by the Debtor.

In three (3) of the Non-Bankruptcy Cases, judgments have been entered against certain Non-Debtor Parties as follows:

- N. Bayer in the Katz Case, the Segal McCambridge Case and the Exchange Ontario Case;

- Grasso in the Katz Case;

- Meakim in the Katz Case and the Segal McCambridge Case.[9]

---

[9] The orders against Grasso, Meakim and WSC in the Katz Case were entered after the Motion in this court was filed and before the November 18, 2009 hearing.

## III.

Briefly put, the Debtor contends that the court should enjoin the Defendants from proceeding in the Non-Bankruptcy Cases against the Related Non-Debtors because the litigation "will cause significant interference with, and impairment of, the Debtor's efforts to reorganize." (Motion ¶9).

More specifically, the Debtor contends that permitting the Non-Bankruptcy Cases to proceed will distract the Debtor's key individuals from devoting the necessary time, energy (and in the case of Grasso, assets) to the Debtor's reorganization. The Debtor also suggests that, due to the existence of the Related Non-Debtors' indemnification rights against the Debtor, the entry of judgments against at least some of the Related Non-Debtors effectively would establish claims against the Debtor outside of the bankruptcy claims allowance process. Finally, the Debtor emphasizes that it seeks an injunction for only a limited time because it expects to file its plan of reorganization during the first quarter of 2010.

The responding Defendants who contest the Motion assert that the Debtor has not met its burden of proof for the grant of an injunction under 11 U.S.C. §105. They contend that the evidence is insufficient to support a finding that the Non-Bankruptcy Cases will interfere with the Related Non-Debtors' efforts to assist the Debtor's reorganization. With respect to N. Bayer, they contend that the evidence does not support the conclusion that the Debtor is under any obligation to indemnify him. To the extent that the Debtor does have an indemnification obligation, certain Defendants suggest that the damage is already done insofar as judgments have already been entered against N. Bayer in three (3) of the Non-Bankruptcy Cases, against Meakim in two (2) of the Non-Bankruptcy Cases and against Grasso in one (1) of the Non-Bankruptcy

-11-

Cases.[10]


# IV.


The automatic stay of the Bankruptcy Code, 11 U.S.C. §362(a), applies only to a "debtor"

and "may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a

similar legal or factual nexus to the . . . debtor." McCartney v. Integra Nat'l. Bank North, 106

F.3d 506, 509-10 (3d Cir. 1997).  However, "[t]he law is clear that in some circumstances

---

[10]    One of the Defendants, Katz, questions the good faith of the Debtor and the Related
Non-Debtors.  He points out that his judgment was obtained by default after the state court had permitted
three (3) separate law firms to withdraw from the representation of the Related Non-Debtors, all three (3)
law firms having contended in their respective motions that the Related Non-Debtors had been
uncooperative.  (See Exs. Katz-2 through Katz-4; Ex. D-1).  Katz suggests that granting the Motion
would benefit those same "uncooperative" parties, whom Katz contends were dilatory and acted in bad
faith throughout the litigation of his action against them, would reward their gamesmanship and would be
an unjust "end run" around the state court's default judgment.

        While Katz makes a plausible argument, he offered no evidence to support his contention
that the Related Non-Debtors' failure to obtain new counsel was part of a pattern of dilatory,
inequitable conduct.  Nor is it obvious to me why the failure of an party who is a natural person (and who
has  a right to proceed pro se) to obtain counsel is grounds for the entry of a default judgment.  I am not
prepared to draw the inference that the Debtor and the Related Non-Debtors have acted in bad faith on
the meager record presented: three (3) hearsay documents and a court order that entered a default
judgment against the Related Non-Debtors (apparently without a hearing) because they did not obtain
counsel within twenty-one (21) days of the order granting their prior counsel leave to withdraw.

        Notwithstanding the boilerplate allegations of the Related Non-Debtors' state court
counsel regarding lack of cooperation, it is likely that each counsel's prime motivation for seeking leave
to withdraw was the lack of payment of fees.  Significantly, two (2) of the three (3) motions for leave to
withdraw were filed after the Debtor's chapter 11 bankruptcy case was filed, making it likely that the
Debtor was financially unable (and perhaps legally unable) to pay the counsel fees incurred by the
Related Non-Debtors.  (That said, I do find it puzzling that Grasso would permit a default judgment to be
entered against him, thereby exposing the substantial personal assets that he described in his testimony).

        To be clear, I make no value judgment regarding the propriety of the Related Non-
Debtors' conduct in the Katz case.  I conclude only that the evidence of bad faith on the part of the
Debtor and the Related Non-Debtors was inadequate to bar the grant of §105 injunction if the Debtor has
otherwise satisfied the requirements for obtaining one.

discretionary stays, beyond the scope of section 362, are appropriate and that a court's power to issue such injunctions stems from section 105 of the Code."[11]  In re Philadelphia Newspapers LLC, 410 B.R. 404, 412 (Bankr. E.D. Pa. 2009).

The issuance of an injunction that restrains creditors from enforcing their claims against nondebtors in non-bankruptcy fora is an exception to the general principle that "to enjoy the benefits of bankruptcy a recipient needs to suffer the burdens."  In re M.J.H. Leasing, Inc., 328 B.R. 363, 366 (Bankr. D. Mass. 2005); see also In re Juneau's Builders Ctr., Inc., 57 B.R. 254, 256 (Bankr. M.D. La. 1986) ("the stay must, in some sense, be 'earned' by the beneficiary of the stay submitting to the invasive authority of the bankruptcy court into his private financial life. . . [thus] assur[ing] a comprehensive commitment of the beneficiary's assets to the satisfaction of his obligations, a fundamental aspect of the debtor/creditor readjustment process that justifies the extraordinary effect of a stay of creditor pursuit of self-interest"); In re Venture Properties, Inc., 37 B.R. 175, 177 (Bankr. D.N.H. 1984) ("It has been a cardinal principle of bankruptcy law from the beginning that its effects do not normally benefit those who have not themselves 'come into' the bankruptcy court with their liabilities and all their assets") (emphasis in original).  A routine expansion of the automatic stay to cover nondebtors who are related to the debtor would effect "a wholesale restructuring of the expectations of those involved in commercial transactions without any indication from Congress that such profound change was intended."  M.J.H. Leasing, 328 B.R. at 366 (quoting Venture Properties, Inc., 37 B.R. at 177).

---

[11]     Section 105 of the Bankruptcy Code states, in relevant portion, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

The entry of an injunction restraining one set of nondebtors from proceeding against another set of nondebtors is appropriate only in "unusual circumstances," McCartney, 106 F.3d at 510, and should "not be granted lightly," In re Excel Innovations, Inc., 502 F.3d 1086, 1095 (9th Cir. 2007).

In general terms, a §105 injunction restraining creditors from proceeding against non-debtors is justified only if the creditors actions would "interfere with, deplete or adversely affect property of the [bankruptcy estate] or . . . would frustrate the statutory scheme embodied in Chapter 11 or diminish [the debtor's] ability to formulate a plan of reorganization." In re Lazarus Burman Assocs., 161 B.R. 891, 898 (Bankr. E.D.N.Y. 1993).

Courts have recognized three (3) circumstances in which the entry of a §105 injunction restraining creditors from proceeding against non-debtors may be appropriate:

1. when the non-debtor owns assets which will either be a source of funds for the debtor or when the preservation of the non-debtor's credit standing will play a significant role in the debtor's attempt to reorganize;

2. upon a showing that the non-debtor's time, energy and commitment to the debtor are necessary for the formulation of a reorganization plan;

3. where the relationship between the non-debtor and debtor is such that a finding of liability against the non-debtor would effectively be imputed to the debtor, to the detriment of the estate.

See, e.g., McCartney, 106 F.3d at 510; Lazarus Burman Assocs., 161 B.R. at 897-900; In re Monroe Well Service, Inc., 67 B.R. 746, 751-52 (Bankr. E.D. Pa. 1986).

More than twenty (20) years ago, the court in Monroe Well Service, outlined the following test for the issuance of a §105 injunction restraining actions against nondebtors:

1. there must be the danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize;

-14-

2.   there must be a reasonable likelihood of a successful reorganization;

3.   the court must balance the relative harm as between the debtor and the creditor
     who would be restrained;

4.   the court must consider the public interest, which requires a balancing of the
     public interest in successful bankruptcy reorganizations with other competing
     societal interests.

Monroe Well Service, 67 B.R. at 752-53.

The Monroe Well Service test, which slightly restates the traditional standards for the

issuance of a preliminary injunction, has been accepted and employed by other courts.  See, e.g.,

In re PTI Holding Corp., 346 B.R. 820, 826 (Bankr. D. Nev. 2006); In re Labrum & Doak, LLP,

237 B.R. 275, 306 (Bankr. E.D. Pa. 1999); In re United Health Care Org., 210 B.R. 228, 233

(S.D.N.Y. 1997), appeal dismissed, 147 F.3d 179 (2d Cir. 1998); In re Fowler Floor & Wall

Covering Co., Inc., 93 B.R. 55, 57 (Bankr. M.D. Pa. 1988); In re University Medical Ctr., 82

B.R. 754 (Bankr. E.D. Pa. 1988); see also Excel Innovations, 502 F.3d at 1095-96.

The determination whether to grant or deny a §105 injunction is intensely fact driven.

Thus, it is not surprising that there is a multitude of  reported cases both granting and denying

§105 injunctions in cases in which a debtor seeks to restrain one set of non-debtors from

enforcing their claims against other non-debtors.  See, e.g., M.J.H. Leasing, 328 B.R. at 365-69

(collecting cases);  Lazarus Berman Assocs., 161 B.R. at 898-99 (same); In re Steven P. Nelson,

D.C., P.A., 140 B.R. 814, 816-17 (Bankr. M.D. Fla.1992) (same); Monroe Well Service, 67 B.R.

at 751-52 (same).  As with any request for the entry of a traditional  injunction, the outcome

tends to be driven by the debtor's ability or inability to marshal facts demonstrating that the

pending nonbankruptcy proceedings against the nondebtors pose a serious risk to its

reorganization and the court's assessment of the relative harms each side may suffer from the

grant or denial of the injunction request.

With these principles in mind, I return to the case <u>sub judice</u>.


## V.

As stated at the outset, the Debtor seeks to restrain the Defendants from prosecuting their

claims against six (6) Non-Debtor Parties.  One (1) of the Related Non-Debtors is an officer of

the Debtor, two (2) are both owners and managers of the Debtor and three (3) are entities owned

and controlled by one (1) of the owner/managers of the Debtor.  The pending cases the Debtor

seeks to restrain also sit in differing procedural postures.  Notably, in several cases, judgments

have already been entered against certain Non-Debtor Parties.

In light of the factual mosaic presented, I find it most efficient to distinguish among the

Related Non-Debtors in evaluating the Debtor's injunction request.


**A.  N. Bayer, Grasso and Meakim**

### 1.

N. Bayer has no ownership interest in the Debtor.  No evidence was presented suggesting

that he will contribute his personal assets to the Debtor's reorganization or that those assets are

essential to the effort.  The Debtor's request that his creditors be enjoined from proceeding

against him is based primarily on the conventional rationale that N. Bayer plays a key role in the

management of the Debtor and that the Debtor's operations and reorganization require his full

time and attention.  As stated in Part II.A., supra, I credit the evidence suggesting that N. Bayer's

efforts are critical to the reorganization of the Debtor.  See nn.5-6, supra.

Similarly, I conclude that diversion of Grasso's time, energy and attention to defense of

the Non-Bankruptcy Cases poses a meaningful threat to the Debtor's reorganization.  Whatever

the evidence lacked in the way of specificity regarding the precise amount of time he expends in

managing the Debtor, see n.5, supra, is more than made up by his role as the Debtor's primary

investor.  After hearing his testimony, I have little doubt that his active participation is integral to

the Debtor's reorganization and that he will need to devote a substantial amount of his time in the

immediate weeks ahead to the formulation and implementation of the Debtor's reorganization

strategy.  Requiring him to spend a substantial amount of time addressing the Non-Bankruptcy

Cases poses a meaningful threat to the Debtor's successful reorganization.

The evidence regarding Kevin Meakim was the least fulsome of the three individual Non-

Debtor Parties.  Nonetheless, I credit N. Bayer's testimony that Meakim is substantially involved

in the Debtor's operations.  I note that Meakim is the managing member of the Debtor LLC and

is the representative who signed the bankruptcy petition and the monthly operating reports on

behalf of the Debtor.

Therefore, with respect to N. Bayer, Grasso and Meakim, I am satisfied that the first

prong of the Monroe Well Service test is met.[12]

---

[12]     For this reason, I need not determine whether the Debtor is bound by an indemnity
agreement with N. Bayer such that the entry of a judgment against him would be tantamount to the entry
of a judgment against the Debtor.  See n.3, supra.  I note also that with respect to those Defendants who
have not obtained default judgments against Grasso and Meakim, there appears to be a significant risk
that the indemnification provision of the Operating Agreement would cause Grasso's and Meakim's
liability to be imputed to the Debtor.  Such a result may be materially detrimental to the Debtor's

(continued...)

**2.**

Turning next to the second prong of the test, I observe that both the Debtor and the

responding Defendants parties paid little, if any, attention at the hearing to the issue whether

there is a reasonable likelihood that the Debtor will successfully reorganize.  Perhaps this reflects

an implied concession by some of the Defendants – i.e., those asserting that the Debtor was the

recipient of a fraudulent transfer – that the Debtor's business is valuable and therefore, is a

"good candidate for reorganization."  PTI Holding Corp., 346 B.R. at 831.

In any event, at this early stage of the case, there are sufficient indicia that the Debtor has

a reasonable prospect of reorganizing.  After commencement of this case, the Debtor negotiated

consensual cash collateral agreements with its primary secured lender.  As a result, it has

continued to operate its business and has more than forty (40) franchisees operating in different

locations.  It has committed itself to the prompt filing of its reorganization plan.  It has filed

monthly operating reports that suggest that the Debtor is operating at or near a break-even level

and is not hemorrhaging cash.[13]  It appears that this case, like PTI Holding Corp., "is not a 'file

and flush' case in which a debtor files, seeks a sale under Section 363 of the debtor's best assets,

and then converts to a chapter 7 after the sale so that someone else  –  a chapter 7 trustee –  can

clean up the resulting mess."  Id.   Like the court in PTI Holding Corp., I conclude that the

---

[12](...continued)
reorganization because these are potentially large claims that the Debtor disputes.  Thus, the Debtor's
indemnification obligation provides an independent basis for concluding that the first prong of the
Monroe Well Service test has been satisfied with respect to Grasso and Meakim.

[13]        See Debtor's Monthly Operating Reports for August and September 2009 (Docket Entry
Nos. 93, 117).

Debtor is entitled to some additional time to develop its reorganization plan.

**3.**

The third prong of the Monroe Well Service test requires that the court balance the

relative harms as between the Debtor and the Defendants.  This is "arguably, the most critical

element" in the analysis. 2 Collier on Bankruptcy ¶105.03[1], at 105-41 (Alan N. Resnick, Henry

J. Sommer eds., 16th ed. 2009) ("Collier").  This element "overtly and consciously acknowledges

that each party to the litigation has rights to be considered, and overly and consciously attempts

to determine which of those rights is paramount."  PTI Holding Corp., 346 B.R. at 831.  It is also

significant, however, that in making this choice, "the bankruptcy court has broad powers to shape

the injunction so as to minimize the harm to the creditor."  2 Collier ¶105.03[1], at 105-41.

Thus, it would be somewhat inaccurate to perceive a court's decision whether to grant or deny an

injunction will always be an "all or nothing" choice between the rights of the Debtor and the

nondebtor parties.  In at least some cases, the court may be able to accommodate the critical

needs of all the parties.

In this case, the potential harm to the Debtor is manifest: the distraction of the Non-

Bankruptcy Cases threatens the Debtor's ability to reorganize.  I must weigh this risk against the

potential harm to the Defendants.

In general terms, the potential harm to the Defendants should not be minimized.  The

Defendants have a substantial interest in "the enforcement of bargained-for rights."  PTI Holding

Corp., 346 B.R. at 831; see also K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 916 (1st Cir.

1989) ("there is a strong public interest in fair dealing and the solemnity of contracts; if

-19-

commerce is to function in our capitalistic system, entrepreneurs must play by the rules").

Further, litigants always face some risk to their ability to succeed in their litigation when delayed

from obtaining a prompt judicial resolution of his or her claims.  See Shearin v. Doe 1 through

10, 2007 WL 4365621, at *2 (D. Del. Dec. 11, 2007) (a lengthy delay creates risk of loss of

evidence, including the fading of the memory of witnesses); In re Genesis Health Ventures, Inc.,

367 B.R. 516, 522 (Bankr. D. Del. 2007) (same).  In cases involving commonplace requests for

the entry of money judgments, litigants also face potentially increased risks with respect to the

collectibility of any judgment entered.

At the same time, however, the Defendants have not identified any particularized harm

they are likely to suffer if delayed for a short period of time from enforcing their remedies against

N. Bayer, Grasso and Meakim.  The Debtor has been careful to tailor the Motion to limit the time

period of the injunction requested to approximately seven (7) months,[14] a relatively modest, finite

period of time.[15]  There is little risk of a loss of evidence during that time period.  Nor has there

been any showing that there is a known risk of dissipation of assets by N. Bayer, Grasso or

Meakim.  Indeed, other than Grasso's generalized testimony regarding his interests in numerous

businesses, there is nothing in the record regarding the nature or extent of N. Bayer's, Grasso's or

Meakim's assets.

---

[14]     I calculate the seven (7) month period by taking the Debtor's statement that it will file its
chapter 11 plan in the "first quarter of 2010" (i.e., by March 31, 2009) and adding approximately ninety
(90) days for the confirmation process.

[15]     This is not to say that I will enter an injunction of seven (7) months' duration.  See Part
VI., infra.  My point is only that the Debtor has recognized that the duration of any injunction must be
limited.

In considering the consequences of the requested injunction on the Defendants, it is also relevant that the Defendants are substantial creditors of the Debtor.[16] Thus, a successful reorganization may be in the interest of the Defendants in two (2) ways, in that it preserves: (1) the value of an entity (the Debtor) that may be obligated to the Defendants and (2) the value of an asset (i.e., the ownership interest in the Debtor) that may be available to satisfy the personal debts of Grasso and Meakim.

Further, the Debtor necessarily will address the Defendants' disputed claims in its proposed plan in some fashion. Ideally, the plan confirmation process will engender fruitful, substantive negotiations among the parties with a view toward a global settlement and a consensual plan. Or, perhaps and alternatively, the success of the reorganization will depend on the outcome of litigation, with the Debtor vigorously prosecuting objections to the Defendants' and perhaps initiating other litigation. Whatever direction this case takes, it is unlikely that the Defendants' claims will lie dormant during any period in which an injunction is in force. Movement toward resolution of those claims, at least in some fashion, will take place.

In my best judgment in balancing the competing interests of the parties under the third prong of the Monroe Well Service test, I conclude that, if appropriately circumscribed, the benefits to the Debtor of an injunction restraining the prosecution of the Non-Bankruptcy Cases

---

[16]    I am aware that the Debtor disputes its liability to some or all of the Defendants. In using the term "creditor," I do not suggest the Defendants' claims against the Debtor are valid and allowable. I use the term as a term of art, referring to entities that have a prepetition "claim" against the Debtor. The term "claim" includes asserted rights to payment that are "disputed." See 11 U.S.C. §101(5), (10).

against N. Bayer, Grasso and Meakim outweigh the detriment to the Defendants.[17]

**4.**

The last prong of the <u>Monroe Well Service</u> test is whether the issuance of the injunction

is in the public interest.  Here, the issuance of the injunction will serve the public interest in

several ways.[18]

To the extent that the injunction is necessary to and will foster the Debtor's

reorganization it serves "one of the most important public interests."  <u>In re Integrated Health

Services, Inc.</u>, 281 B.R. 231, 239 (Bankr. D. Del. 2002); <u>accord</u> <u>PTI Holding Corp.</u>, 346 B.R. at

832.  In this regard, I have considered the potentially negative consequences that the failure of the

Debtor's reorganization effort and the liquidation of its business would have on its own staff of

nine (9) employees as well as on its more than forty (40) franchisees.  The franchisees are

separate businesses with their own owners and employees.  Thus, the Debtor's failure is likely to

have a negative ripple effect beyond the consequences to its owners and management (N. Bayer,

Grasso and Meakim) that is not in the public interest.[19]

Further, the bankruptcy system also has an interest in protecting its claim resolution

---

[17]      The details of the appropriate limitations on the injunction are set forth in Part VI., <u>infra</u>.

[18]      I observe and acknowledge that there is some analytic overlap between the "balancing of harms" and "public interest" components of the §105 injunction test.  In balancing the benefits and the harms of the affected parties, courts necessarily take public policy considerations into account.

[19]      This is not to say that the public interest requires that Debtor be permitted to reorganize without satisfying all of the Bankruptcy Code's requirements for confirmation of a chapter 11 plan.  <u>See</u> 11 U.S.C. §1129.  Rather, I suggest only that there is some public interest served by the Debtor's reorganization and that this a factor favoring the issuance of the injunction it seeks.

process.  The issuance of an injunction would prevent the entry of judgments in the Non-Bankruptcy Cases against Grasso and Meakim which could effectively determine the Debtor's rights and obligations.  Id. at 833 ("[a]n injunction here protects that core process, and allows it to function in the manner anticipated by Congress").

Finally, the issuance of the injunction may lead to the concentration of litigation in the bankruptcy court with the concomitant beneficial effect of promoting judicial economy, particularly if the bankruptcy reorganization process as a whole results in some type of comprehensive resolution of some or all of the Defendants' claims against the Debtor and the Related Non-Debtors.

I perceive no particular countervailing public policy considerations – other than the appropriate reluctance with which a bankruptcy court should issue a stay restraining the rights of creditors against nondebtors.  To the extent that there are competing public policy interests here, I conclude that the public interest is better served by the issuance of the injunction.


**B.  CSI**

CSI is an entity owned by Grasso and Meakim.  It is in the business of roasting coffee beans and supplies product to the Debtor's franchisees.  The record suggests that it has been named as a defendant in only one of the Non-Bankruptcy Cases, the Katz Case.  No judgment has been entered against CSI in that litigation.  The Debtor has no duty to indemnify CSI for any liability that it may be determined to have in the Katz Case.

From the meager evidence offered with respect to CSI, it is possible to infer that CSI plays a significant role in the operation of the Debtor's franchisees.  It does, after all, supply

coffee to businesses that hold themselves out as coffee houses.  The successful operation of the

franchisees, in turn, is important to the Debtor because the Debtor derives revenue from ongoing

payments it receives from the franchisees.   However, I conclude that the Debtor did not meet the

burden of proof necessary to justify the issuance of an injunction.

It is neither obvious nor intuitive that one (1) lawsuit against a party that supplies product

to entities that have a franchise relationship with the Debtor – even a party that may be a

substantial supplier of product to the Debtor's franchisees (and there is nothing in the record to

support that last assumption) –  poses a material threat to the Debtor's reorganization.  The

Debtor did not generate a record that would permit me to conclude that: (a) allowing the Katz

Case to proceed against CSI, would so disrupt CSI that (b) CSI's ability to service its customers

(the Debtor's franchisees) would be impaired and (c) the franchisees would be unable to obtain

the products they need from alternative suppliers, and (d) the negative effect on the franchisees

would be materially detrimental to the Debtor.  The connection between the litigation against CSI

and the Debtor is too attenuated to justify the intervention of this court to restrain this one non-

debtor from proceeding in its lawsuit against this particular, other non-debtor. For this reason, the

request for an injunction to restrain the Katz Case against SCI fails to satisfy the requirement that

there be danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize.

In concluding that the Debtor's request with respect to CSI does not meet the first prong

of the <u>Monroe Well Service</u> test, I am cognizant that the Katz Case against CSI is one of a

number of lawsuits in which Grasso and entities he controls have been targeted.  I have

considered the possibility that the litigation against CSI might materially distract its principal,

Grasso (as well as its other principal, Meakim), from carrying out their duties to the Debtor

during the next critical months in the reorganization process.  But I am not convinced that this is

the case.

I understand the Debtor to contend that Grasso's and Meakim's formation of CSI and the

purchase of the Bucks County Coffee assets was subsequent to and unconnected with the SCI-

Debtor asset sale transaction that is the focus of the plaintiff's allegations in the Katz Case.

Grasso's testimony suggested that  CSI is a separate business interest, albeit one that itself has a

business relationship with the Debtor's franchisees as a vendor.  As a result, the legal and factual

issues central to CSI's defense in the Katz Case strike me as distinct and most likely more

limited than the factual issues surrounding the propriety of the SCI-Debtor asset sale transaction.

It is not apparent to me that the time Grasso and Meakim will have to spend defending this

particular action will be especially time consuming or burdensome.  Further, Grasso testified that

he does not work 100% of the time on the Debtor's affairs; he has other businesses.  I have no

way to distinguish between the time Grasso spends generally on those other businesses from the

time he would have to devote to CSI's in the Katz case.  On the present record, the Debtor has

not established that Grasso's and Meakim's participation in the defense of CSI would impair his

ability to work diligently to accomplish the Debtor's reorganization.[20]

For all of these reasons, no §105 injunction will issue to restrain litigation against CSI.

---

[20]       I recognize that there is some tension between the decision to enjoin the Defendants from
proceeding against Grasso and Meakim and permitting litigation to proceed against CSI.  Defendant Katz
should not take the denial of the injunction as to CSI as an invitation to do an "end run" around the
injunction.  If further litigation efforts directed against CSI are so broad based as to constitute indirect
collection activity against Grasso or Meakim or if the litigation otherwise imposes an unduly heavy
burden on Grasso or Meakim, upon request of the Debtor I am prepared to revisit the issue.

**C.  WSC and WSCMG**

The case for an injunction to restrain the Defendants' litigation against WSC and WSCMG is virtually nonexistent.

Grasso testified that WSC is a corporation that he formed four (4) years ago that presently has no assets.  On cross-examination, Grasso mentioned in passing that WSC would somehow be a vehicle through which Grasso would infuse a further capital contribution into the Debtor as part of the reorganization.  However, he provided no detail regarding the role WSC would play in the process, whether WSC's unblemished credit position was somehow essential to the unquantified financing to be provided or whether Grasso's financial contribution could be provided to the Debtor by Grasso directly or through some other entity that he has or could create.

As for WSCMG, Grasso stated that he did not know anything about that entity and even expressed doubt whether such an entity even exists.  There is nothing further in the evidentiary record regarding WSCMG.

On this record, there is no basis for a finding that the Defendants' litigation against WSC and WSCMG poses any threat to the Debtor's reorganization or that the issuance of a §105 injunction is appropriate.


**VI.**

Finally, I address the contours of the injunction to be issued.

**A.**

As stated earlier, I have concluded that a §105 injunction restraining the Defendants from

litigating their claims against N. Bayer, Grasso and Meakim is warranted. Like Judge Fox in

Monroe Well Service, I exercise the court's equitable powers to restrain the conduct of one set of

non-debtors against another set of non-debtors "very reluctantly."  67 B.R. at 747.  It is therefore

imperative to tailor the injunction to be as narrow as possible, yet adequate to accomplish the

purpose that it serves.

Here, the purpose of the injunction is to provide the Debtor's key management personnel

the freedom from personal distraction so that they can devote their unfettered efforts to the

Debtor's reorganization, thereby giving the Debtor an opportunity to formulate and attempt to

confirm its plan of reorganization.  Interestingly, courts that have rejected this generally accepted

rationale for the issuance of a §105 injunction have reasoned that denial of the injunction could

have the same effect:

> We are unpersuaded that the defendants' lawsuit will so destroy [debtor's
> principal's] incentive or so affect him psychologically that he will lose the desire
> or ability to lead the [d]ebtor through reorganization. One could just as easily
> surmise that such pressure upon a debtor's principal will galvanize him into
> exerting his best efforts to bring about an early Chapter 11 plan for the payment of
> all creditors, including in particular the creditor hounding him . . . .

In re Apollo Molded Products, Inc.,  83 B.R. 189, 192-94 (Bankr. D. Mass. 1988).

Whether or not one accepts the ultimate conclusion of the court in Apollo Molded

Products, the implicit concern it expresses is valid.  The §105 injunction should not provide

nondebtors with a comfortable, "free ride" on the coattails of the debtor. The issuance of a §105

injunction should not eliminate the keen sense of urgency that insider nondebtors would

-27-

otherwise have to resolve, as promptly as possible, the outstanding legal and monetary disputes

that gave rise to the bankruptcy case.  Stated another way, the nondebtors should continue to feel

pressure to expedite the reorganization process so that the injunction may be lifted as soon as

possible and the ordinary legal relationships among the nondebtors restored.

For these reasons, I do not accept the Debtors' implicit assumption that a preliminary

injunction for a fixed time period of approximately seven (7) months, see n.15, supra, is

appropriate in this case.  The Debtor has not developed a record that provides a specific

explanation why it may need until March 31, 2009 to file a proposed plan of reorganization.

In this case, the filing of a plan by March 31, 2010 would be within six (6) months after

the commencement of the case.  I acknowledge that the filing of a chapter 11 plan in a business

case within six (6) months after its commencement is not uncommon, raises no obvious red flags

suggesting dilatoriness and, in some circles, may even be considered prompt.  However, the

Debtor is a small business.[21]  It does not have a particularly large number of creditors or an

amount of debt that appears disproportionate to its income and assets.  It does not seem to have a

particularly complicated set of business relationships, although it does have a group of motivated,

apparently hostile creditors (which may hinder the Debtor's reorganization).  Without some

further explanation from the Debtor and based on the limited information available, I surmise

that there are only a relatively few number of reorganization approaches that the Debtor may

---

[21]      Here, I do not use the term "small business" as a term of art.  The Debtor is not a "small
business debtor" as defined in 11 U.S.C. §101(51)(D), apparently because its aggregate noncontingent
liquidated secured and unsecured debt as of the date of the petition was not more than $2 million.  (See
Debtor's Schedules D, E, F, Docket Entry No. 47 (disclosing debts in excess of $2 million)).  However,
the Debtor is a small business as that term is used in common parlance.  It has nine (9) employees and its
annual gross receipts run approximately $1 million.

attempt in this case.  Once the Debtor chooses its strategy and takes concrete steps down the plan

confirmation path, I can foresee obstacles that may slow down the process, but at this point, I do

not know why the process cannot begin sooner rather than later.

Put a little differently, absent the Debtor's invocation of the equitable powers of the court,

I might otherwise be prepared to grant the Debtor more time to deliberate before it filed its

chapter 11 plan.  But where the Debtor seeks and obtains the extraordinary remedy of a

preliminary injunction, restraining some of its creditors from proceeding against nondebtors, an

adjustment must be made in the ordinary reorganization process to fairly accommodate the

competing interests of the debtor and its creditors.[22]

In this case, the appropriate adjustment required after the issuance of the §105 injunction

is closer judicial oversight of this reorganization case with an insistence that the Debtor propel

the plan confirmation process as efficiently and expeditiously as possible.  Succinctly put,

equitable relief must be coupled with rigorous case management.

This reasoning leads me to restrict the term of the preliminary injunction that will issue so

that, by its own terms, it terminate naturally within a relatively short period of time.  The §105

injunction that I will enter to restrain the Defendants from prosecuting or initiating litigation

against N. Bayer, Grasso and Meakim will expire on February 15, 2009, unless extended by

further court order.  I will hold a hearing on February 12, 2009 to determine whether the

injunction should be extended.  By that date, I expect the Debtor will have either filed a proposed

---

[22]       To restate this in pseudoscientific terms, the grant of extraordinary relief to the Debtor
tends to upset the delicate balance of the bankruptcy ecosystem, requiring some further action to restore
that balance.  Also, I do not mean to suggest that a §105 injunction is the only reason why a bankruptcy
case might increase its oversight of a chapter 11 reorganization.  Requests by creditors for relief may
have the same effect.  See, e.g.,11 U.S.C. §362(d), §1112(b)).

chapter 11 plan that has a reasonable prospect of being confirmed or will otherwise demonstrate

that it has made substantial progress toward achieving a confirmable plan.  The extension of the

preliminary injunction will depend on whether the Debtor can demonstrate that it has made

suitable progress in the reorganization process.


**B.**

One further issue must be addressed.  I have not lost sight of the fact that several of the

Defendants already have judgments against N. Bayer, Grasso and Meakim.  As explained below,

the entry of those  judgments makes it appropriate to impose a condition on the preliminary

injunction.

In one sense, the entry of the judgments does not alter the need for the injunction.  While

the judgments eliminate the time and energy that N. Bayer, Grasso and Meakim would spend in

defending the Non-Bankruptcy Cases (unless they were to initiate appropriate proceedings  relief

from the judgments), arguably, they would spend an equivalent amount of time dealing with the

disruptions in their personal life that execution against their personal assets would likely create.

Thus, the need for an injunction in order to protect the reorganization process is as great, if not

greater, with respect to the Defendants who hold judgments against N. Bayer, Grasso and

Meakim.

At the same time, however, the entry of the judgments creates a greater risk that the

Defendants holding the judgments could be subjected to mischief, such as the transfer of assets

by N. Bayer, Grasso and Meakim.  In pointing this out, I do not suggest that there is any basis to

believe that N. Bayer, Grasso and Meakim have done so or intend to do so.  But it is a concern

that arises naturally in the mind of any judgment creditor.

In these circumstances, an appropriate quid pro quo for the benefits N. Bayer, Grasso and Meakim will receive under the §105 injunction is that they provide their judgment creditors with a financial disclosure.  While I am unconcerned about the precise form of the disclosure, the financial disclosure should contain the same substantive content as is found in Schedules A-G of the bankruptcy schedules.  See Fed. R. Bankr. P.1007(b).  This is information that the judgment creditors would be entitled to discover, absent a bankruptcy court injunction, in order in order to ascertain what assets are available for satisfaction of the judgment.  Here, the judgment creditors will receive this information, but will not be permitted to issue execution against the disclosed assets pursuant to applicable nonbankruptcy law so long as the injunction is in place.

The required financial disclosure imposes only a modest burden on N. Bayer, Grasso and Meakim, while restricting the rights of the judgment creditors only so far as necessary to protect the Debtor's interest in reorganizing.  Also, in the event that issues arise in the future regarding asserted fraudulent transfers by N. Bayer, Grasso and Meakim, the disclosure provides the judgment creditors with an appropriate financial baseline prepared contemporaneously rather than retrospectively.

In my view, this disclosure requirement fairly accommodates the competing interests of the Debtor, N. Bayer, Grasso and Meakim on the one hand, and the judgment creditors on the other.[23]

---

[23]    In light of the short duration of the preliminary injunction and the financial disclosure condition, the risk of harm to the Defendants that hold judgments (or to any of the Defendants for that matter) is sufficiently minimized to warrant the exercise of my discretion to waive the requirement under Fed. R. Bankr. P.7065 and Fed. R. Civ. P. 65(c) that the Debtor post security.  See Elliott v. Kiesewetter,

(continued...)

## VII.

For the reasons and in the manner set forth above, the Motion will be granted in part and

denied in part.

Date:   __December 4, 2009__

                                  **ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

---

[23](...continued)
98 F.3d 47, 59-60 (3d Cir. 1996); Bella Vista United v. City of Philadelphia, 2004 WL 825311, at *10
n.11 (E.D. Pa. Apr. 15, 2004).